FILED IN OPEN COURT
U.S.D.C. - Atlanta

JAN – 6 2026

KEVIN P. WEIMER, Clerk
By_____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*v.*<br><br>MARCELLO C. BANES AND<br>STEPHANIE R. LINDSEY | Second Superseding Criminal Indictment<br><br>No. 1:24-CR-00195 |

THE GRAND JURY CHARGES THAT:

## COUNT 1
### (Money Laundering Conspiracy)

1.  From a date unknown to the grand jury, but by at least on or about August 27, 2018, to at least on or about July 15, 2019, in the Northern District of Georgia and elsewhere, the defendants, MARCELLO C. BANES and STEPHANIE R. LINDSEY, knowingly combined, conspired, and agreed with each other to commit offenses against the United States in violation of Title 18, United States Code, Section 1956 and Section 1957, that is, to knowingly:

   a.  conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activities, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, and honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346, knowing that said transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and while

conducting and attempting to conduct such financial transactions,
knowing that the property involved in the financial transactions
represented the proceeds of some form of unlawful activity, in violation
of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

b. engage and attempt to engage in monetary transactions by, through,
and to a financial institution, affecting interstate and foreign commerce,
knowing that such transactions involved criminally derived property of
a value greater than $10,000, such property having been derived from
specified unlawful activities, that is, wire fraud, in violation of Title 18,
United States Code, Section 1343, and honest services wire fraud, in
violation of Title 18, United States Code, Sections 1343 and 1346, in
violation of Title 18, United States Code, Section 1957.

### Background

At all times material to this Indictment:

2. In 1999, pursuant to the Development Authorities Law (O.C.G.A. § 36-62-4), four Georgia counties—Jasper, Morgan, Newton, and Walton—adopted resolutions and established the Joint Development Authority of Jasper County, Morgan County, Newton County, and Walton County (the JDA).

3. The goal of the JDA was to create an industrial area to attract industries that would bring jobs and investment to the region. Specifically, the goal was to create a research park for high-tech and bio science industries.

4. The JDA was controlled by a Board of Directors, which consisted of eight directors, two from each of the four member counties. Each county's Board of

Commissioners appointed its county's two representatives, one of whom had to be a member of that county's Board of Commissioners and the other of whom had to be a taxpayer residing within that county.

5. Under Georgia law, a JDA director shall never:

    a. take any official action with regard to any matter under circumstances which he knows or should know that he has a direct or indirect monetary interest in the subject matter of such matter or in the outcome of such official action;

    b. use any information coming to him confidentially in the performance of governmental duties as a means for making private profit; or

    c. accept any economic opportunity under circumstances where he knows or should know that there is a substantial possibility that the opportunity is being afforded him with intent to influence his conduct in the performance of his official duties.

6. Although the JDA may, under Georgia law, purchase from, sell to, borrow from, loan to, contract with, or otherwise deal with any director or any organization or person with which any director of the authority is in any way interested or involved, they may only do so if (1) any interest or involvement by such director is disclosed in advance to the JDA and is recorded in the minutes of the JDA, (2) any interest or involvement by such director with a value in excess of $200 per calendar quarter is published in a public notice, (3) the director having a substantial interest or involvement is not present at that portion of a JDA meeting during which discussion of any matter is conducted involving any

3

such organization or person, and (4) the director having a substantial interest or involvement does not participate in any decision of the authority relating to any matter involving such organization or person.

7. Defendant MARCELLO C. BANES was the Chairman of the Newton County (Georgia) Board of Commissioners and represented Newton County on the JDA. As a public official and JDA director, BANES owed a duty to provide honest services to the JDA and the citizens of Newton County, Georgia.

8. In 2000, the JDA purchased approximately 1,600 acres located 30 minutes east of metro Atlanta on I-20 and partnered with Technology Park/Atlanta, Inc., n/k/a Technology Park/Atlanta, LLC (TPA) to develop a mixed-use master-planned community there known as Stanton Springs.

<u>The Subject Property</u>

9. Among the 1,600 acres in Stanton Springs, one 40.328-acre tract was planned to be developed for commercial, retail, and hospitality purposes.

10. Although the JDA owned the tract, Stanton Springs, LLC had a contractual option to purchase part or all of the tract from the JDA at a set price.

11. The JDA hired TPA Group to market this tract.

12. Company A was interested in purchasing land in this tract.

13. On or about May 28, 2018, Defendant BANES (using his Newton County government email address) emailed a topographical survey of approximately 29.3 acres of this tract to a representative of Company A.

14. On or about June 14, 2018, Defendant BANES (using his Newton County government email address) emailed another topographical survey of the entire

4

40.328-acre tract to a representative of Company A.

15. On or about June 29, 2018, Company A drafted an offer to purchase 29 acres of this tract.

16. On or about July 2, 2018, Defendant BANES had his assistant (using her Newton County government email address) email the offer by Company A to purchase 29 acres of the tract to a representative of TPA Group.

### Defendant LINDSEY's Brokerage Agreement with Company A

17. Defendant STEPHANIE R. LINDSEY was a close friend of Defendant BANES and was an attorney and licensed real estate broker in Newton County.

18. Defendant LINDSEY wholly owned CSL Realty Group, LLC (CSL Realty).

19. On or about August 27, 2018, Defendant LINDSEY emailed a draft buyer brokerage agreement to Defendant BANES (at his personal email address). The draft agreement identified CSL Realty as the broker but did not identify the buyer. The draft agreement stated that the unidentified buyer was to pay CSL Realty a $150,000 commission when the buyer closed on the purchase of the 29.3 acres of property represented in an attached topographical survey, which was the same survey Defendant BANES had emailed to a representative of Company A on or about May 28, 2018. Defendant BANES (using his personal email address) forwarded the draft agreement to a representative of Company A.

20. On or about August 28, 2018, the representative of Company A responded to Defendant BANES (at his personal email address), requesting changes to the brokerage agreement. Defendant BANES (using his personal email address) forwarded the requested changes to Defendant LINDSEY.

21. On or about September 4, 2018, Defendant LINDSEY emailed a revised version of the brokerage agreement to Defendant BANES (at his personal email address). Defendant BANES (using his personal email address) forwarded the revised brokerage agreement to the representative of Company A.

22. On or about September 5, 2018, Defendant LINDSEY and the representative of Company A signed a finalized version of the brokerage agreement, which identified Company A as the buyer and stated that Company A was to pay CSL Realty a $150,000 commission when Company A closed on the purchase of the property.

23. At the time CSL Realty and Company A entered into the brokerage agreement, Defendants BANES and LINDSEY misled Company A into believing the commission was for LINDSEY only. Neither BANES nor LINDSEY disclosed to Company A that LINDSEY would pay most of the commission—which was contingent on the JDA voting to approve the sale of the land from the JDA to Stanton Springs, LLC with the understanding that Stanton Springs, LLC would sell the land to Company A — to BANES, who would be voting on whether the JDA would approve the sale.

24. Had Company A's owners known Defendant BANES would receive any of the commission, they would not have entered into the brokerage agreement.

25. Defendant LINDSEY performed little to no work related to Company A's attempt to purchase the identified tract of land.

### Company A's Purchase of the Subject Property

26. On or about October 10, 2018, Company A and Stanton Springs, LLC

entered into an agreement for Company A to purchase the entire 40.328 acres identified in the topographical survey Defendant BANES had sent to Company A on or about June 14, 2018, which survey was attached to the purchase agreement as an exhibit. In the agreement, the parties acknowledged that Stanton Springs, LLC did not then own the land and that Stanton Springs, LLC had to first exercise its contractual right to buy the land from the JDA and acquire the land before the sale to Company A could close. Defendant LINDSEY did not participate in negotiating this deal, and Company A represented in the purchase agreement that it did not have a broker.

27. At a JDA board meeting on or about November 27, 2018, a representative of TPA Group introduced Company A's team that was proposing to buy and develop the tract.

28. At a JDA board meeting on or about January 22, 2019, the JDA (including Defendant BANES) unanimously passed a resolution authorizing the sale of the tract to Stanton Springs, LLC with the understanding that Company A would purchase the property from Stanton Springs, LLC.

29. Defendant BANES never disclosed to the JDA that, upon Company A's acquisition of the land, Company A would pay $150,000 to Defendant LINDSEY, who would funnel most of the payment to BANES.

30. On or about March 1, 2019, Company A and Stanton Springs, LLC closed the deal conveying the tract to Company A. Defendant LINDSEY's CSL Realty commission was not listed on the closing statement.

7

31. On or about March 2, 2019, Defendant LINDSEY emailed a representative of Company A to congratulate him on the deal, and she attached the brokerage agreement, indicating that Company A owed her a $150,000 payment.

32. On or about March 4, 2019, Company A paid Defendant LINDSEY $150,000 by check, which LINDSEY deposited into CSL Realty's bank account at United Bank with an account number ending in 1910 (the CSL Realty account).

33. This was CSL Realty's only real estate closing for 2019, and the company reported only $155,805 of income for that entire year. Before the $150,000 deposit, the CSL Realty account contained only $514.77. The only other deposits into the CSL Realty account between on or about March 4 and July 15, 2019, were $3,305 on or about April 15, 2019, and $2,500 on or about July 15, 2019.

## Manner and Means

34. In furtherance of the conspiracy and to effect and accomplish the objects of it, Defendants BANES and LINDSEY knowingly conducted financial transactions that were designed to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity, and knowingly engaged in monetary transactions involving criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity. Those transactions included the following:

    a.  On or about March 13, 2019, Defendant LINDSEY wrote a $100,000 check from the CSL Realty account to LatReb Logistics, LLC (LatReb). LatReb had been organized on or about February 19, 2019, as a sole proprietorship wholly owned by Defendant BANES with LINDSEY

8

serving as registered agent.  Over a year later, on or about August 15, 2020, Defendants BANES and LINDSEY entered into an operating agreement, which provided that BANES's percentage interest was 51 percent and LINDSEY's was 49 percent.

b. On or about March 14, 2019, Defendant BANES opened a new bank account at Synovus Bank for LatReb and deposited the $100,000 check from CSL Realty into that account, which had an account number ending in 9011 (the LatReb account).

c. On or about March 15, 2019, Defendant BANES opened a new personal bank account at Synovus Bank and transferred $75,000 of the $100,000 from the LatReb account to this new personal account, which had an account number ending in 6950 (the first BANES account).

d. On or about May 22, 2019, Defendant BANES transferred another $4,988 from the LatReb account to the first BANES account.

e. On or about June 21, 2019, one of Defendant BANES's preexisting personal bank accounts held at Synovus Bank, which had an account number ending in 0496 (the second BANES account), had a balance of $11,358.94.  That day, Defendant BANES transferred the entire balance of the first BANES account, $80,356.99 (which consisted entirely of the two transfers BANES had made from the LatReb account into the first BANES account plus interest earned), into the second BANES account.

f. On or about June 21, 2019, Defendant BANES also transferred $4,000 from the LatReb account to the second BANES account.  No other

money was deposited into the second BANES account between June 21, 2019, and June 24, 2019.

g. On or about June 24, 2019, Defendant BANES wired $87,788.76 from the second BANES account to a closing attorney's IOLTA account as part of the purchase of BANES's new house.

h. On or about July 15, 2019, Defendant LINDSEY wrote a $28,000 check from the CSL Realty account to Company B for basement/foundation work on Defendant BANES's new house.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS 2-3
(Transactional Money Laundering)

35. The Grand Jury realleges and incorporates by reference paragraphs 2 through 34 of this Indictment as if fully set forth herein.

36. On or about the dates set forth below, in the Northern District of Georgia and elsewhere, the defendant, MARCELLO C. BANES, knowingly engaged and attempted to engage in monetary transactions by, through, and to a financial institution, affecting interstate and foreign commerce, knowing that such transactions involved criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activities, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, and honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346:

| Count | Date(s) | Description |
|-------|---------|-------------|
| 2 | June 21, 2019 | BANES transferred $80,356.99 from the first BANES account to the second BANES account. |
| 3 | June 24, 2019 | BANES wired $87,788.76 from the second BANES account to a closing attorney's IOLTA account. |

All in violation of Title 18, United States Code, Section 1957.

## COUNT 4
(Transactional Money Laundering)

37. The Grand Jury realleges and incorporates by reference paragraphs 2 through 34 of this Indictment as if fully set forth herein.

38. On or about the date set forth below, in the Northern District of Georgia and elsewhere, the defendants, MARCELLO C. BANES and STEPHANIE R. LINDSEY, aided and abetted by each other, knowingly engaged and attempted to engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, knowing that such transaction involved criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activities, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, and honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346:

| Count | Date(s) | Description |
|-------|---------|-------------|
| 4 | July 15, 2019 | LINDSEY wrote a $28,000 check from the CSL Realty account to Company B for basement/foundation work on BANES's new house. |

All in violation of Title 18, United States Code, Section 1957, and Section 2.

11

## COUNT 5
(Concealment Money Laundering)

39. The Grand Jury realleges and incorporates by reference paragraphs 2 through 34 of this Indictment as if fully set forth herein.

40. On or about the date set forth below, in the Northern District of Georgia and elsewhere, the defendants, MARCELLO C. BANES and STEPHANIE R. LINDSEY, aided and abetted by each other, knowingly conducted and attempted to conduct a financial transaction affecting interstate and foreign commerce, as listed below, which involved the proceeds of specified unlawful activities, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, and honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, and while conducting and attempting to conduct such financial transaction, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity:

| Count | Date(s) | Description |
|-------|---------|-------------|
| 5 | July 15, 2019 | LINDSEY wrote a $28,000 check from the CSL Realty account to Company B for basement/foundation work on BANES's new house. |

All in violation of Title 18, Section 1956(a)(1)(B)(i), and Section 2.

## COUNT 6
(Making and Subscribing a False Tax Return)

41. The Grand Jury realleges and incorporates by reference paragraphs 2 through 34 of this Indictment as if fully set forth herein.

42. Between on or about July 7, 2020, and on or about July 28, 2020, in the Northern District of Georgia, the defendant, STEPHANIE R. LINDSEY, d/b/a CSL Realty Group LLC, did willfully make and subscribe a false U.S. Income Tax Return for an S Corporation, IRS Form 1120-S, for the calendar year of 2019, which was verified by a written declaration that it was made under the penalties of perjury, and which was filed with the Internal Revenue Service. Defendant LINDSEY did not believe that IRS Form 1120-S to be true and correct as to every material matter, in that the income tax return falsely reported business deductions on Lines 9, 19, and 20, and falsely reported total ordinary business income on Line 21 in the amount of $376, whereas LINDSEY then and there knew that CSL Realty Group LLC's business deductions were falsely reported and that its ordinary business income was in excess of the amount reported, in violation of Title 26, United States Code, Section 7206(1).

## COUNT 7
(Making and Subscribing a False Tax Return)

43. The Grand Jury realleges and incorporates by reference paragraphs 2 through 34 of this Indictment as if fully set forth herein.

44. Between on or about October 15, 2020, and on or about November 3, 2020, in the Northern District of Georgia, the defendant, STEPHANIE R. LINDSEY, did willfully make and subscribe a false U.S. Individual Income Tax Return, IRS

Form 1040, for the calendar year of 2019, which was verified by a written declaration that it was made under the penalties of perjury, and which was filed with the Internal Revenue Service.  Defendant LINDSEY did not believe that IRS Form 1040 to be true and correct as to every material matter, in that the income tax return falsely reported other income on Line 7a, and falsely reported taxable income on Line 11b in the amount of $448,832, whereas LINDSEY then and there knew that her other income and taxable income were in excess of the amounts reported, in violation of Title 26, United States Code, Section 7206(1).

## COUNT 8
### (False Statements to a Federal Agent)

45. The Grand Jury realleges and incorporates by reference paragraphs 2 through 34 of this Indictment as if fully set forth herein.

46. On or about May 10, 2023, in the Northern District of Georgia, the defendant, MARCELLO C. BANES, willfully and knowingly made materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States, to a special agent of the Federal Bureau of Investigation, that is:

   a. When discussing Company A's purchase of land at Stanton Springs, an FBI special agent asked Defendant BANES: "Did [Company A's representative] have anybody representing him at all, like did he have an attorney, did he have a real estate agent, anybody like that?" BANES answered: "Aww, that I don't know."

    b. The special agent also asked Defendant BANES: "Is [LINDSEY] involved in any of the real estate transactions with the JDA? That you are aware of?" BANES answered: "I don't think so."

47. The statements and representations were false because, as Defendant BANES then and there knew, he had used his personal email account to facilitate the negotiation of a buyer brokerage agreement between Company A and Defendant LINDSEY's company CSL Realty.

All in violation of Title 18, United States Code, Section 1001.

## COUNTS 9-14
### (Wire Fraud)

48. The Grand Jury realleges and incorporates by reference paragraphs 2 through 34 of this Indictment as if fully set forth herein.

### Background

At all times material to this Indictment:

### The Small Business Administration

49. The U.S. Small Business Administration ("SBA") was an executive branch agency of the U.S. government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

### The EIDL Program

50. The Economic Injury Disaster Loan ("EIDL") program was an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

51. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or about March 2020 and was designed to provide emergency financial assistance to the millions of Americans who were suffering from the economic effects caused by the COVID-19 pandemic.

52. One source of relief provided by the CARES Act was the authorization for the SBA to provide EIDLs of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic.

53. To obtain an EIDL for COVID-19 relief, a qualifying business was required to submit an application to the SBA and provide information about its ownership and operations, such as the number of employees and gross revenues and cost of goods sold for the twelve-month period preceding January 31, 2020. The applicant also was required to certify that all the information in the application was true and correct to the best of the applicant's knowledge.

54. EIDL applications were submitted directly to the SBA and processed by the agency with support from a government contractor. The amount of the loan, if the application was approved, was determined based, in part, on the information provided by the applicant about employment, revenue, and cost of goods sold, as described above. Any funds issued under the EIDL program were issued directly by the SBA through the U.S. Treasury. EIDL funds were required

16

to be used for certain purposes, such as working capital to make regular payments for operating expenses, which included payroll, rent/mortgage, utilities, and other ordinary business expenses, and to pay business debt.  It was not permissible to use EIDL funds to create a new business.

55. EIDL applications were received in and processed using computer servers located in the states of Iowa, Virginia, and Washington.  EIDL disbursement payments were initiated by the SBA using computer servers located in the state of Colorado, which transmitted the payment information to the Treasury using computer servers located in the state of Virginia.

<u>The Targeted EIDL Advance and Supplemental Targeted Advance Programs</u>

56. On December 27, 2020, the Economic Aid to Hard-Hit Small Businesses, Non-Profits, and Venues Act (Economic Aid Act) was signed into law, creating an opportunity for eligible businesses to receive a Targeted EIDL Advance ("TA"), which provided up to $10,000 of supplemental funding.  To qualify, the business had to be in a low-income community as defined by section 45D(e) of the Internal Revenue Code; had to have suffered greater than thirty percent economic loss over an eight-week period since March 2, 2020, compared to the previous year; and must have had 300 or fewer employees.

57. On March 11, 2021, the American Rescue Plan Act of 2021 was signed into law, creating an opportunity for eligible businesses to receive a Supplemental Targeted Advance ("STA"), which provided up $5,000 of supplemental funding. To qualify, the business had to be in a low-income community as defined by section 45D(e) of the Internal Revenue Code; had to have suffered greater than

17

fifty percent economic loss over an eight-week period since March 2, 2020, compared to the previous year; and must have had ten or fewer employees.

58. To receive a TA or STA, EIDL applicants were required to answer a series of questions to determine eligibility and certify the accuracy of the information provided. TAs and STAs did not require repayment.

### The Scheme to Defraud the SBA

59. From on or about August 17, 2020, to on or about October 20, 2021, in the Northern District of Georgia and elsewhere, the defendant, MARCELLO C. BANES, knowingly devised and intended to devise a scheme and artifice to defraud the SBA, and to obtain money and property from the SBA by means of materially false and fraudulent pretenses, representations, and promises, and by omission of material facts, and for the purpose of executing the scheme and artifice to defraud, with the intent to defraud, caused to be transmitted by means of wire communications in interstate commerce certain writings, signs, signals, pictures, and sounds.

60. It was part of the scheme that:

   a. Beginning on or about August 17, 2020, Defendant BANES submitted a series of six online applications for funds from the SBA in the name of LatReb and one additional business entity controlled by him.

   b. Application #1 (Count 9 – SBA Application #3313707090): On or about August 17, 2020, BANES submitted to the SBA, via the Internet, an application for an EIDL in the name of LatReb. In that application, BANES stated, among other things, that LatReb was a limited liability

18

company engaged in freight business activity, had gross revenues of $110,000 and incurred cost of goods sold of $10,000 for the twelve months prior to January 31, 2020, had one employee, and was 100% owned by BANES. BANES also stated that LatReb was not engaged in any illegal activity. In reality, LatReb did not generate $110,000 of gross revenues or incur cost of goods sold of $10,000 for the twelve months prior to January 31, 2020, and was engaged in illegal activity. Additionally, as of the August 15, 2020, operating agreement executed by BANES and LINDSEY (referenced in Count 1), BANES owned only 51% of LatReb – LINDSEY owned 49%. As a result of this fraudulent application, BANES received a deposit of $49,900 ($50,000 minus a $100 fee) into the LatReb account (Synovus Bank account number ending in 9011) on or about August 31, 2020.

c. Application #2 (Count 10 – SBA Application #3314139737): On or about August 31, 2020, BANES submitted to the SBA, via the Internet, an application for an EIDL in the name of Banes Motors. In the application, BANES stated, among other things, that Banes Motors was a sole proprietorship engaged in automotive repair business activity, had gross revenues of $100,000 and incurred cost of goods sold of $110,000 for the twelve months prior to January 31, 2020, had one employee, and was 100% owned by BANES. In reality, Banes Motors did not generate $100,000 of gross revenues or incur cost of goods sold of $110,000 for the twelve months prior to January 31, 2020. BANES

requested that the SBA deposit funds into the second BANES account (Synovus Bank account number ending in 0496), but the SBA ultimately declined the application.

d. Application #3 (Count 11 – SBA Application #3316654122): On or about January 21, 2021, BANES submitted to the SBA, via the Internet, an application for an EIDL in the name of LatReb. In that application, BANES stated, among other things, that LatReb was an S-Corporation engaged in freight business activity, had gross revenues of $110,000 and incurred cost of goods sold of $10,000 for the twelve months prior to January 31, 2020, had one employee, and was 51% owned by BANES and 49% owned by LINDSEY. BANES also stated that LatReb was not engaged in any illegal activity. In reality, LatReb did not generate $110,000 of gross revenues or incur cost of goods sold of $10,000 for the twelve months prior to January 31, 2020, and was engaged in illegal activity. BANES requested that the SBA deposit funds into the LatReb account (Synovus Bank account number ending in 9011), but the SBA ultimately declined the application.

e. Application #4 (Count 12 – SBA Application #3313707090): On or about March 14, 2021, BANES submitted to the SBA, via the Internet, as a supplement to SBA Application #3313707090, an application for a TA in the name of LatReb. In that application, BANES stated, among other things, that LatReb was not engaged in real estate development or investment and had three employees. BANES did not update or correct

his prior statements in the application file that LatReb was a limited liability company that had gross revenues of $110,000 and incurred cost of goods sold of $10,000 for the twelve months prior to January 31, 2020, was 100% owned by BANES, and was not engaged in any illegal activity.  In reality, LatReb did not generate $110,000 of gross revenues or incur cost of goods sold of $10,000 for the twelve months prior to January 31, 2020, and was engaged in illegal activity.  Additionally, as of the August 15, 2020, operating agreement executed by BANES and LINDSEY (referenced in Count 1), BANES owned only 51% of LatReb – LINDSEY owned 49%.  As a result of this fraudulent application, BANES received a deposit of $10,000 from the SBA into the LatReb account (Synovus Bank account number ending in 9011) on or about April 21, 2021.

f.  Application #5 (Count 13 – SBA Application #3313707090): On or about May 13, 2021, BANES submitted to the SBA, via the Internet, as a supplement to SBA Application #3313707090, an application for an STA in the name of LatReb.  In that application, BANES stated, among other things, that LatReb was not engaged in real estate development or investment and had three employees.  BANES did not update or correct his prior statements in the application file that LatReb was a limited liability company engaged in freight business activity, had gross revenues of $110,000 and incurred cost of goods sold of $10,000 for the twelve months prior to January 31, 2020, was 100% owned by BANES,

and was not engaged in any illegal activity.  In reality, LatReb did not generate $110,000 of gross revenues or incur cost of goods sold of $10,000 for the twelve months prior to January 31, 2020, and was engaged in illegal activity.  Additionally, as of the August 15, 2020, operating agreement executed by BANES and LINDSEY (referenced in Count 1), BANES owned only 51% of LatReb – LINDSEY owned 49%. As a result of this fraudulent application, BANES received a deposit of $5,000 from the SBA into the LatReb account (Synovus Bank account number ending in 9011) on or about May 19, 2021.

g.  Application #6 (Count 14 – SBA Application #3313707090): On or about October 21, 2021, BANES submitted to the SBA, via the Internet, as a supplement to SBA Application #3313707090, an application for a $218,200 modification of the original $50,000 EIDL issued to LatReb. BANES did not update or correct his prior statements in the application file that LatReb was a limited liability company engaged in freight business activity, had gross revenues of $110,000 and incurred cost of goods sold of $10,000 for the twelve months prior to January 31, 2020, was 100% owned by BANES, and was not engaged in any illegal activity.  In reality, LatReb was not conducting freight business activity, did not generate $110,000 of gross revenues or incur cost of goods sold of $10,000 for the twelve months prior to January 31, 2020, and was engaged in illegal activity.  BANES requested that the SBA deposit

funds into the LatReb account (Synovus Bank account number ending in 9011), but the SBA ultimately declined the application.

**Execution of the Scheme to Defraud**

61. On or about the dates set forth in the table below, in the Northern District of Georgia and elsewhere, BANES, did, with the intent to defraud, for the purpose of executing the above-described scheme, cause to be transmitted by means of wire communications in interstate commerce the writings, signs, signals, pictures, and sounds described below:

| Count | Date | Wire |
|---|---|---|
| 9 | August 17, 2020 | Transmission of application for EIDL in the name of LatReb Logistics, LLC, SBA Application #3313707090, to the SBA via the Internet |
| 10 | August 31, 2020 | Transmission of application for EIDL in the name of Banes Motors, SBA Application #3314139737, to the SBA via the Internet |
| 11 | January 21, 2021 | Transmission of application for EIDL in the name of LatReb Logistics, LLC, SBA Application #3316654122, to the SBA via the Internet |
| 12 | March 14, 2021 | Transmission of application for Targeted EIDL Advance in the name of LatReb Logistics, LLC, SBA Application #3313707090, to the SBA via the Internet |
| 13 | May 13, 2021 | Transmission of application for Supplemental Targeted Advance in the name of LatReb Logistics, LLC, SBA Application #3313707090, to the SBA via the Internet |
| 14 | October 21, 2021 | Transmission of application for EIDL Modification in the name of LatReb Logistics, LLC, SBA Application #3313707090, to the SBA via the Internet |

All in violation of Title 18, United States Code, Section 1343.

## COUNTS 15-16
(Theft of Government Funds)

62. The Grand Jury realleges and incorporates by reference paragraphs 2 through 34 and 49 through 60 of this Indictment as if fully set forth herein.

63. On or about the dates set forth in the table below, in the Northern District of Georgia and elsewhere, the defendant, MARCELLO C. BANES, did knowingly and willfully embezzle, steal, purloin, and convert to his own use and the use of another, money and things of value of the United States exceeding the sum of $1,000, namely, funds administered by the U.S. Small Business Administration in the form of the funds described below:

| Count | Date | Amount |
|-------|------|--------|
| 15 | April 21, 2021 | $10,000 |
| 16 | May 19, 2021 | $5,000 |

All in violation of Title 18, United States Code, Section 641.

### Forfeiture

Upon conviction of one or more of the offenses alleged in Counts One through Five of this Indictment, the defendants, MARCELLO C. BANES and STEPHANIE R. LINDSEY, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), all property, real or personal, involved in such offense, or any property traceable to such property, including, but not limited to, the following:

MONEY JUDGMENT: A sum of money in United States currency, representing the amount of property, real or personal, obtained as a result of each offense alleged in Counts One through Five of this Indictment.

Upon conviction of one or more of the offenses alleged in Counts Nine through Sixteen of this Indictment, the defendants, MARCELLO C. BANES and STEPHANIE R. LINDSEY, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real or personal, which constitutes or is derived from proceeds traceable to the offenses, including, but not limited to, the following:

MONEY JUDGMENT: A sum of money in United States currency, representing the amount of proceeds obtained as a result of each offense alleged in Counts Nine through Sixteen of this Indictment.

If, any property subject to forfeiture, as a result of any act or omission of a defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

the United States intends, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c) and Title

18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of said defendants up to the value of the forfeitable property.

A _____ BILL

_____
FOREPERSON

THEODORE S. HERTZBERG
  United States Attorney

BRENT ALAN GRAY
  Assistant United States Attorney
Georgia Bar No. 155089

BRET R. HOBSON
  Assistant United States Attorney
Georgia Bar No. 882520

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181